### *In re* Jones' Estate.

(*Surrogate's Court, Onondaga County, Filed March,* 1893.)

1. Executors and administrators—Accounting—Jurisdiction.

Surrogates' Courts have power under Code Civ. Pro. sec. 2472 (providing that such courts may, upon an executor's accounting, construe the provisions of a will whenever necessary to make the decree as to distribution), to determine as to the validity of an antenuptial agreement made by decedent and his intended wife, made in contemplation of death, whose subject matter is the distribution of his property after his death.

2. Antenuptial contract—Fraud—Burden of proof.

The presumption is against the validity of such a contract, and the burden of proof is cast upon the husband or his representatives to show perfect good faith, and strict proof will be required, especially where the provision for the widow is inequitable.

**3. SAME.**

Decedent, when 70 years of age, married his deceased wife's niece, aged 52. He was then worth $20,000. Prior to the marriage he had an agreement drawn up by his attorney by which his intended wife was to receive on his death $2,000 in lieu of dower and interest in decedent's personal estate. This was signed by decedent and his wife the evening prior to the marriage, and there was no evidence of prior negotiation in reference thereto. The wife testified it was not read to her, and she only became aware of its contents after the marriage, and decedent admitted to several persons that in having the paper signed he wished to convince his sisters that his wife had not married him for his money. *Held*, that although the wife had subsequent to the marriage acquiesced in the agreement, the burden of proof which the law placed upon the husband's representatives to show perfect good faith had not been met with, and the agreement was invalid.

Judicial settlement of the accounts of George A. Warburton, as administrator of the estate of William Jones, deceased.

Brooks & Walrath, for administrator; Fuller & Glen, for widow and contestant.

GLASS, S.—This is a proceeding upon the petition of George A. Warburton, administrator of the estate of William Jones, for the final judicial settlement of his accounts, and for the distribution of the surplus of the estate among the persons entitled thereto. The intestate died on the 31st day of August, 1890, at Camillus, in this county, leaving him surviving no descendant nor parent, but leaving him surviving Margaret A. Jones, his widow, and two sisters, residing in this county, and three nephews and a niece, children of a deceased sister, residing in England, his only next of kin, all of whom are parties to this proceeding. In the account filed the administrator charges himself with the sum of $23,954.66 in cash and good securities, and credits himself with having paid out for debts, taxes, funeral expenses, and expenses of administration the sum of $1,317.72, and also with having invested the sum of $2,000 in a certain bond and mortgage to secure the payment of an annuity to the widow, in supposed pursuance of the terms of an antenuptial agreement hereinafter referred to. The administrator,

in his petition, which is the basis of this proceeding, among other things, alleged: "That said decedent, William Jones, in contemplation of his marriage with his said surviving widow, Margaret A. Jones, entered into an antenuptial bond, duly sealed and acknowledged by them, under and by the terms of which said widow was to receive, after the death of said William Jones, from his estate, in case she survived him, interest of $2,000, payable annually, in lieu of all right of dower or interest in said decedent's personal estate, which said bond is hereby referred to and made a part of this petition."

Upon the return of the citation, the widow appeared specially, objecting to the distribution of the estate in this proceeding, principally because the alleged antenuptial bond was void for want of due execution, and because of the practice of fraud upon her at the time of its execution, and alleging that she had commenced an action to set aside the said agreement, and to have the same declared null and void, and asking for a postponement of this proceeding until the determination of an action which she had commenced in the Supreme Court to have said bond declared null and void. Such postponement was made for some months, but it appears that the Supreme Court action was subsequently discontinued, and the widow appeared generally in this proceeding by her attorneys, and filed an answer raising objections to sundry items of the account, and, among others, to the above-mentioned item of $2,000, invested for the benefit of the widow, and alleging the invalidity of the said antenuptial agreement, because, among other things, of fraudulent misrepresentation and concealment of its contents practiced upon her by the intestate at the time she signed it. Upon the hearing, no objections raised by the widow's answer were pressed, except those relating to the validity of the antenuptial agreement, which would necessarily include the $2,000 item above referred to. A considerable amount of testimony was taken upon that issue, and at its close the petitioner's counsel raised the objection that this court had no jurisdiction to determine as to the validity or invalidity of the antenuptial agreement in question; so that,

practically, the principal questions now to be decided are: First, has this court jurisdiction in this matter to adjudicate as to the validity of the antenuptial agreement? Second, is the antenuptial agreement valid and binding upon the widow so as to cut her off from what would otherwise be her distributive share of the estate?

The question raised as to jurisdiction is a serious and perplexing one. If this court has the power in this proceeding to determine as to the validity of the agreement in question, it is a power implied from and incidental to the authority conferred by section 2472 of the Code of Civil Procedure upon the Surrogates' Courts, "to direct and control the conduct and settle the accounts of executors, administrators, and testamentary trustees;" to enforce the * * * distribution of the estates of decedents." That this section of the Code confers power upon Surrogates' Courts in a proceeding having for its object the settlement of an executor's accounts, and the obtaining of a decree directing the distribution of a fund in his hands, when all the parties in interest are present, to construe the provisions of a will, and determine their meaning and validity, whenever necessary in order to make the decree as to distribution, is now settled beyond all question. Garlock v. Vandevort, 128 N. Y. 374, 28 N. E. Rep. 599; Riggs v. Cragg, 89 N. Y. 480. And if the provisions of a will may be construed, and their validity determined, by the Surrogate's Court, why, upon principle and by analogy, may not a like jurisdiction extend to the construction or determination as to the validity of an agreement made by the decedent, and the person who is to become his wife, and possibly his widow, signed by the decedent himself, made in contemplation of his death, whose very subject matter is the distribution of his property after his death? The similarity in these respects between an antenuptial agreement and a will seems to suggest a reason why the numerous cases cited by the petitioner's counsel holding that the Surrogate's Court has no power to determine as to the validity of a release by a legatee or next of kin to the executor or administrator, or of an assignment of

a legacy or distributive share to a third party, may not be appli-
cable to the present case. In all of those cases, as I remember,
the instrument, agreement, or deed whose validity the surrogate
was held to have no power to determine was one made, not by
the testator in contemplation of the future distribution of his
property, but by other persons, after his death. But whatever
doubts I should otherwise have as to my jurisdiction to adjudi-
cate upon the validity of the instrument in question, the case of
Pierce v. Pierce, 71 N. Y. 154, seems to be decisive upon the
question, and seems to leave no way open but for me to hold that
this court has jurisdiction in this proceeding to determine as
to the validity of the instrument in question. That was a pro-
ceeding precisely like this, before the surrogate of Delaware
county. Upon the final accounting of the administratrix of
one Pierce, the validity of an antenuptial agreement made by
the intestate with his intended wife was in question before the
surrogate. The widow, upon the accounting, maintained that
the agreement was void for fraud practiced upon her which in-
duced her to sign it. The surrogate held the agreement to be
valid and in full force, and that for that reason she was not
entitled to a share as his widow in the distribution of his estate,
and only allowed her the amount named in the agreement. The
General Term of the Supreme Court, upon appeal, held that the
agreement was invalid, by reason of the fraud perpetrated upon
the wife, and modified the decree of the Surrogate accordingly,
and allowed to the widow her distributive share of the estate,
and the judgment of the General Term was affirmed by the
Court of Appeals. It seems to follow as a necessary and logical
conclusion that the Court of Appeals must have considered that
the surrogate had the jurisdiction when the proceeding was be-
fore him, to make the same determination in the case which the
Supreme Court made upon appeal to it. I do not feel at liberty
to disregard the authority of the case of Pierce v. Pierce, and
therefore hold that this court has jurisdiction in this proceeding
to determine as to the validity of the agreement in question.

The agreement substantially provided that, in consideration

of the payment of the interest on $2,000 annually during her life to the intended wife, she relinquished all dower and all interest in the personal property of her intended husband in case she survived him. The intestate was at the time of the marriage worth at least $20,000, and she thought him worth, as she swears in answer to the question of the petitioner's counsel, $40,000. She was at the time 52 years of age, and he was 70. She was a niece of his first wife, who died in 1869. She had known him as her uncle by marriage for 40 years or more, and during her aunt's lifetime was accustomed to visit in the family about once in two years, and stay a month or so at a time, but from 1872 to 1885 it appears her visits ceased entirely. In the fall of the latter year she made a visit of a week's length at her uncle's house, which apparently led to a mutual agreement to marry, as arrangements were made that the marriage should take place on the following 13th of January, at her brother's home in Saratoga Springs, where she made her home. Before leaving for Saratoga Springs he had procured the agreement in question to be drawn up by Mr. Lyboult, his attorney at Camillus, and as drawn up by Mr. Lyboult it was a complete instrument in all its details, even to the insertion of the date of the instrument, which was written the 13th of January, the proposed wedding day. He took it with him to Saratoga Springs, where he arrived at her brother's house early in the evening of January 12th, and after an interview alone with his intended wife, when, presumably it was signed by both of them; later in the evening, together with her, acknowledged the execution of it before a notary who had been called in for that purpose. This acknowledgment was taken in the presence of the widow's brother and other members of his family, but nothing was said by any one at the time of the acknowledgment as to the object or contents of the paper, except that, before the notary left, the decedent told him that he was "doing well by Maggie." He had also earlier in the evening, while asking the widow's brother to procure a notary to "take the acknowledgment of a paper of a matter between himself and Maggie," told the brother that he

was "going to fix Maggie nicely," and had also told the brother's wife earlier in the evening, while waiting for the notary, that he was going to give his wife $2,000. The paper was presented by him to the notary already signed, and, after the notary had filled out and signed his certificate of acknowledgment, was taken possession of by the decedent, and he put it in an envelope into his pocket. How long he kept it does not appear clearly, but it is apparent that for several months at least, soon after the marriage, it was in the possession of the wife, but, as she claims, in a sealed envelope. She testifies that she never read the paper or heard it read, and the earliest date which the evidence tends to impute knowledge to her of the contents of the paper, aside from such presumptions as flow from the fact of signing and having possession of the writing, is the summer after her marriage.

The essential fact to be determined is, what took place between these parties when the instrument was signed by them which led to its being signed by Mrs. Jones? The one party is not here to give his version of the transaction; the lips of the other are closed by the wise mandate of the law; and we are left in the solution of this somewhat vexatious question to depend upon other and not always the most satisfactory kind of evidence. Without attempting to further detail the circumstances leading up to and attending the execution of this antenuptial agreement, or the relations of the parties prior or subsequent to their marriage, in January, 1886, or the circumstances disclosed by the testimony tending to prove or disprove knowledge on the part of the widow, even before the death of Mr. Jones, of the terms of the agreement, I am convinced by the proofs in the case that at the time the paper was signed, Mrs. Jones did not know its contents; that its contents had been fraudulently concealed from her by the intestate; and that she was induced to sign it by representations made to her by the intestate at, or shortly prior to, its execution, that it contained provisions more favorable to her, than it did in fact contain. In the first place, the very terms of the contract itself, viewed in the light of the

surrounding circumstances, arouse the suspicion that she did not know what she was signing when she signed this paper. It is apparent that the marriage was one based not entirely upon sentiment, and it is fairly deducible from the facts that the bettering of her financial condition may very naturally and very properly have been one of her motives in entering into this relation. He was worth $20,000, and it is safe to say her estimate of his possessions was not smaller than that sum. With these circumstances in mind, it is hard to believe that she would have knowingly agreed to accept so comparatively trifling a sum as the interest on $2,000 during her lifetime as her share of the estate, in case she should survive him. The fact, too, that he had the contract drawn up complete in every detail, even to its date, before he started for Saratoga, leaving nothing open for negotiation between himself and the other party when he should meet her, is also a significant circumstance in the case. It may be, of course, that the details of the agreement had previously been settled between the parties, but there is no evidence in the case showing any prior meeting of the parties more recent than the occasion of her week's visit to Camillus in the fall of 1885; so that no opportunity was afforded for such prior negotiation, except through the mails or through third parties; and there are no suggestions either of correspondence or of the intervention of third parties in the case.

The statements made by the deceased to George Langdon and to Mr. Corey, the notary, at the time the paper was being acknowledged, that he was "going to do nicely by Maggie," and to Mrs. Langdon, that he was going to give his future wife $2,000, I am forced to believe, were made by him for the purpose of warding off scrutiny on the part of the relatives into the contents of the paper. I can hardly believe that Mr. Jones himself felt that the provision which the agreement made for his widow was a liberal or adequate one. But, if three reputable witnesses in this case are to be believed, the decedent, in his lifetime, made admissions relating to this contract and the circumstances attending its execution which, with the other facts of

the case, leave no room for doubt but that the intended wife was deceived into signing this paper by the intended husband's fraudulent concealment of the contents of the writing, and partly, at least, by his representation to her that his purpose in having the instrument signed was to show to his sisters, to convince them that she did not marry him for his money, by way of reconciling them to his remarriage. Miss Frances Langdon, a sister of the widow, testified that on the evening the paper was signed, at her brother's house, in Saratoga Springs, and after it was signed and acknowledged before a notary, she (the witness) and Mr. Jones and his intended wife were sitting in the back parlor, conversing on general topics, when her sister spoke up, and, addressing Mr. Jones, said, "William, I ought to have read that paper before I signed it;" and that he said, "Margaret, that would make no difference; it is a paper that I have had drawn up to show my sisters that you have not married me for my money, but it will never make any difference to you." Mrs. Frances M. Oliver testifies to a conversation had at her house in Syracuse, between herself and the deceased, after the marriage and after the separation of the parties, in which she asked the decedent if his wife realized that she was signing away her rights when she signed this paper, and he said, "No; she didn't." "And I asked him if he said to her that he only asked her to sign that paper to satisfy his sisters that she didn't marry him for his money, as they thought she did, and he said he did, and that she shouldn't lose anything by it." And, again, Margaret A. Clark, a former matron of the "Home" in this city, testifies that on an occasion, when Mrs. Jones was staying at that institution, after her separation from her husband, Mr. Jones came there to request of her (Mrs. Clark) to use her influence to persuade Mrs. Jones to accept a certain sum as a weekly allowance, and in the course of the conversation Mrs. Clark asked him: "Did you ask Margaret to sign a paper, or did she sign a paper the night before she was married? He said 'Yes.' I said, 'For why and for what?' He says, 'I wished to convince my sisters that she was not marrying me for

my money.' I said, 'Did Margaret know what she was signing when she signed that paper ?' The first time I asked the question he shook his head, and didn't speak. Then I asked it again, and he said 'No.' " These admissions, made by the intestate to three different persons, on three separate occasions, are absolutely inconsistent with the existence of good faith on his part in dealing with his intended wife on the occasion of his securing her signature to the instrument in question, and they go a great way in leading me to believe and to find that the intestate fraudulently concealed from his intended wife the full import and contents of the paper which she signed. The law applicable to these facts is furnished by the same case (Pierce v. Pierce, 71 N. Y. 154), as follows: "While an antenuptial contract by which the future wife releases all claims against the estate of her husband upon his decease will be sustained when fairly made, yet, from the confidential relations between the parties, it will be regarded with the most rigid scrutiny; and, where the circumstances establish that the woman has been deceived, or induced by false pretences to enter into the contract, it will be held null and void. It seems that the presumption is against the validity of such a contract, and the burden of proof is cast upon the husband or his representatives to show perfect good faith, and strict proof will be required, particularly where the provision made for the wife is inequitable and unreasonably disproportionate."

Judging the facts in this case by this standard of legal principles, it may safely be said that so much suspicion has been cast upon the transactions which resulted in the signing of this paper that the burden of proof which the law, after proof of such facts, places upon the representatives of the husband to show perfect good faith, has not been met by the administrator. There is considerable proof in the case, and some of it of great force, brought out by the petitioner, tending to show, both before and after the intestate's death, knowledge on the part of Mrs. Jones of the contents of this paper, as well as acquiescence by her in its provisions; and this class of evidence, however, while

it is entitled to great weight in affecting the probabilities of the matter, at most, as it seems to me, tends to show that she thought she was bound by the agreement, and does not bear upon the vital question in this case—viz., what took place at the time of the execution of this instrument?—with the same degree of force as do the admissions of the intestate as to the very transaction itself. The agreement in question must be held to be null and void. A decree may be entered upon five days' notice judicially settling the accounts of the administrator as filed, except the item of $2,000 above referred to, included in the disbursements, which is disallowed, and also allowing, after making proper deductions for cash already paid her, $150 in cash and any household articles (or their value) which ought to have been set off to her as widow as her exemption, and distributing the surplus of the estate among the widow and next of kin, as provided by the statute. All questions of costs and allowances for counsel in this proceeding are reserved until the entry of the decree.